IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK
_____

UNITED STATES OF AMERICA,

                                   **REPORT, RECOMMENDATION
                                   AND ORDER**

v.

                                   12-CR-00014-RJA-JJM

MICHAEL FIJAL,
                               Defendant.
_____

         Defendant Michael Fijal is charged in an Indictment [1][1] with conspiracy and

destruction of a building by fire, in violation of 18 U.S.C. §§2, 844(i). These charges stem from

a May 22, 2011 fire at 179 Mackinaw Street in Buffalo, New York. Id., Count Two. Before me

are Fijal's motions to suppress his statements made to authorities on August 8, 10, and 12, 2011

(Greenman Affidavit [8], ¶¶7-23), for a bill of particulars (id., ¶¶28-42), and for disclosure of

informant identities (id., ¶¶43-63),[2] as well as the government's cross-motion for reciprocal

discovery. Government's Response [10], ¶25.

         An evidentiary hearing on Fijal's suppression motion was held on August 9,

August 24 and October 29, 2012 [39-41], following which the parties filed post-hearing briefs

[48, 49]. Oral argument was held on March 7, 2013 [53]. For the following reasons, Fijal's

motions for a bill of particulars and for disclosure of informant identities are denied, and the

government's cross-motion for reciprocal discovery is granted; and I further recommend that

Fijal's motion to suppress be denied.

---

[1]        Bracketed references are to the CM/ECF docket entries.

[2]        Fijal's counsel has advised my chambers that all other issues raised in his pretrial motion
[8] have been resolved.

## HEARING TESTIMONY

FBI Special Agent ("SA") Luke Humphrey testified that on August 8, 2011, as part of his investigation of an arson fire at 179 Mackinaw Street, he and Joseph Tomizzi, Deputy Commissioner of Operations of the City of the Buffalo Fire Department, went to Fijal's residence at 145 Tennessee Street in the City of Buffalo to interview him. August 9, 2012 hearing transcript [39], pp. 8-9. Prior to this encounter, there had been no law enforcement contact with Fijal, and he was not told in advance that the investigators would be coming to his residence (id., pp. 9, 60).

When they first arrived at Fijal's residence at approximately 5:30 p.m., he was not there, so they returned between 6:00 and 6:30 p.m. (id., p. 9). Fijal's home was surrounded by a fence, and they opened the gate in order to approach the house (id., pp. 46-47). SA Humphrey could not recall whether they rang a doorbell or knocked on the door (id., p. 47).

SA Humphrey and Tomizzi, who were both dressed in plain clothes, identified themselves and explained to Fijal that they were investigating a fire at 179 Mackinaw Street and wanted to talk to him about any knowledge he might have about the fire (id., pp. 9-11). When they asked if they could enter, Fijal invited them into his home (id., p. 11). He stated that Fijal "was cordial" and did not seem overly nervous (id., p. 12). SA Humphrey was armed, but his weapon was not displayed (id., p. 11). He recalled that there was a dog in Fijal's home (id., p. 47).

SA Humphrey was aware of Fijal's professional background as a vice president with a financial institution (id., p. 14). He also knew that Fijal, who was 58 years old at the time of the interview, had no criminal history, and he was unaware of any prior encounters that Fijal

may have had with law enforcement (id., pp. 16, 40). SA Humphrey believed that Fijal lived alone, and he did not observe anyone else in the residence (id., p. 14).

The three entered the living room, which was approximately 14' by 10', where they each sat on separate chairs and couches (id., pp. 13, 15, 50). Fijal was positioned against the wall opposite from where they entered, SA Humphrey was positioned to the right of where they entered, and Tomizzi was positioned against the wall near the door where they entered (id., p. 13).

The interview, which lasted approximately two to two and a half hours, began with general questions to Fijal about the multiple fires at 179 Mackinaw Street (id., pp. 13, 15, 19). SA Humphrey estimated that it took approximately two hours before Fijal indicated that he had some knowledge of the fire (id., p. 51). At that time, they "became less accusatory" (id., p. 58).

Initially, Fijal "had very little information" about the fires (id., pp. 48-49). After approximately twenty minutes, SA Humphrey told Fijal in substance that they thought he was lying (id., p. 56). Fijal became more nervous at that point (id., pp. 60-61). SA Humphrey also told Fijal that his story did not match up with the evidence they had about his financial transaction (id., p. 56). Tomizzi was also asking questions, and told Fijal that they did not believe him (id., pp. 67-68). SA Humphrey warned Fijal that making false statements could be a separate chargeable crime (id., pp. 20-21, 56-57). When asked whether he "had at least in some way tried to indicate to Mr. Fijal that it was important for him to be more truthful . . . and that it was important that he do it that day", SA Humphrey responded, "[t]hat is true" (id., pp. 66-67).

He could not recall how many times they told Fijal that they did not believe he was telling the truth (id., p. 64).

   According to SA Humphrey, they spent the one hour and 40 minute interval before  Fijal provided inculpatory statements trying to convince him to tell the truth (id., p. 68). However, he provided little detail as to what was specifically said during that time interval:

> "Q.   Well, on direct examination, . . . basically you said that - - after the first 20 minutes . . . that you tell him we don't believe you, true?
>
> A.   That's correct.
>
> Q.   We believe you're telling a lie, true?
>
> A.   Again, in substance, yes.
>
> Q.   You go to jail for telling the lie?
>
> A.   Again, I don't know as we said that he would go to jail, but certainly we told him it was a separate crime.
>
> Q.   Okay.  And what else did you say?
>
> A.   I couldn't tell you specifically everything that was said at that point.
>
> Q.   Agent Humphrey, we're talking about an hour and 40 minutes of conversation before he makes an incriminating statement, and that's all you can recall that he said or that you said or Joe Tomizzi said; is that your testimony?
>
> A.   That's all I specifically recall at this point in time, yeah.
>
> Q.   You have no recollection what took place in the intervening . . . one hour and 40 minutes, true?
>
> A.    It's not true that I don't have any recollection.  A specific recollection as to words that were said I cannot tell you.

Q.   But, in fact, at some point in time you would agree, would you not, that his statements go from being at least exculpatory to inculpatory, true?

A.   That's correct" (id., pp. 56-57).

SA Humphrey denied that they raised their "voices in anything that could be considered anger" (id., pp. 21, 64). No threats of physical force were used (id., p. 21). Fijal was not handcuffed or restrained (id., p. 23). Fijal was not told that he was the target of an investigation (id., p. 55), and was not told until "late in the interview" that he was free not to speak with them (id., pp. 61-63).

SA Humphrey could not recall whether he told Fijal that he was free to leave (id., p. 62). However, Fijal was not obstructed from walking out of his house, had he chosen to do so (id., p. 22). Fijal never asked SA Humphrey or Tomizzi to leave his residence, but had he done so, they would have left (id., p. 22). Fijal did not request an attorney, but he may have asked if he should get counsel (id., p. 54).

During the interview, SA Humphrey told Fijal that he "would advise [the prosecutor] of his cooperation", but he did not recall what precipitated this statement or what time it was discussed (id., pp. 55, 65). SA Humphrey denied telling Fijal what benefits he might receive if he ceased lying to them (id., p. 66).

At the conclusion of the encounter, SA Humphrey obtained a telephone number from Fijal, and told him that there may be further communications (id., p. 23). SA Humphrey took notes during the interview, and later prepared a FD-302 report of the interview (id., p. 15; gov. ex. 1 [25-1]). According to SA Humphrey, the first five paragraphs of the report detailed the first 20 minutes of the interview, and it was not until one hour and 40 minutes later that Fijal

provided the incriminating statements contained in paragraph six of the report (id., p. 53).  SA

Humphrey conceded that there was nothing in the report or his handwritten notes as to what

happened during this interval, including what was said to Fijal immediately before he gave the

incriminating statements found in paragraph six, but testified that "[t]he 302 is not supposed to

be a verbatim of an individual's statement"(id., pp. 37, 53, 57-58).

On August 10, 2011, SA Humphrey called Fijal and asked him to meet in order to

ask him some additional questions (id., pp. 24-25).  During this call, they made arrangements to

meet at the Canalside recreation area, a public space in downtown Buffalo (id., pp. 25-26).  This

location was close to where Fijal worked, and SA Humphrey believed that Fijal selected the

location (id., p. 26).

SA Humphrey and Tomizzi met Fijal at Canalside on August 10, 2011  at

approximately 5:30 p.m. (id., p. 26).  They obtained additional details regarding their

investigation (id., p. 27).  Fijal's demeanor during this interview was "somewhat tense, not

uncordial" (id., p. 29).  Less than 30 minutes into the interview, Fijal stated that he needed to

leave, and left (id., pp. 27-28).  At no point during this interview was Fijal handcuffed or

restrained (id., p. 28).  He was not threatened or made any promises (id., p. 28).   SA Humphrey

prepared a FD-302 report of this interview (id., p. 28; gov. ex. 2 [25-2]).

On August 12, 2011, SA Humphrey made another telephone call to Fijal to ask

some follow-up questions to the information he had provided on August 10, 2011 (id., pp. 29-

30).  He was unaware of Fijal's location at the time of the call (id., p. 30).  The call lasted

between five and seven minutes (id., pp. 30-32).  SA Humphrey prepared a FD-302 report of this

interview (id., pp. 30-31; gov. ex. 3 [25-3]).

Joseph Tomizzi, Deputy Commissioner of Operations for the City of Buffalo Fire Department and Commander of the Fire Marshals Unit, testified that he was a certified fire inspector involved in the investigation of the fires at the 179 Mackinaw Street. August 24, 2012 hearing transcript [40], pp. 3-4. According to Tomizzi, he and SA Humphrey went to Fijal's house on August 8, 2011 on "a fact finding mission, to interview Mr. Fijal, and to gather as much information as we can about the fire at 179 Mackinaw" (id., p. 26). At approximately 6:00 p.m. they knocked on Fijal's door, identified themselves to Fijal, told him that they had some questions they wanted to ask him, and asked if he was willing to answer a couple of questions (id., pp. 5, 15). In response, Fijal invited them into his house and directed them to the living room, which was just inside the door and approximately 12' by 14' (id., pp. 5, 24). Tomizzi and SA Humphrey were seated approximately five to six feet away from Fijal (id., pp. 24, 25). They were each seated on separate items of furniture (id., p. 25). Tomizzi was dressed in plain clothes and his firearm was concealed under his shirt (id., p. 5).

SA Humphrey did most of the talking, asking Fijal if he was aware of the fire, and the interview "progressed from there" (id., pp. 6, 10). Fijal, who seemed nervous, initially told them that he did not have any knowledge of exactly how the fire started (id., pp. 16-17, 19, 27-28). When Tomizzi was asked what was said to Fijal after he indicated that he had no knowledge of how the fires started, he testified:

> "A.    "I don't know specifically what he asked him at that point as I did not take any specific notes on that, but I can say that the conversation was still a fact finding mission. We asked him about the neighborhood and if he knew certain people in the neighborhood. I think Agent Humphrey specifically asked him if he knew Jake Jacobsen and at that point he responded, yes, he knew him and he knew him for approximately 50 years. So my recollection is that's where the conversation started towards - -

Q.      And what did you or Agent Humphrey say after he said some of that background information?

A.      Agent Humphrey continued on asking a few more questions about the neighborhood.  At some point during that conversation I believe Agent Humphrey indicated to Mr. Fijal that he wasn't being completely truthful and that . . . there was additional information that he may have had" (id., pp. 20-21).[3]

Tomizzi could not recall how long into the interview it was before SA Humphrey initially told Fijal that he did not believe that he was being truthful (id., p. 21).  SA Humphrey told him that they "had some information that he wasn't being truthful", but Tomizzi did not believe that SA Humphrey identified this information to Fijal (id., pp. 25-26). According to Tomizzi, SA Humphrey told him that the was not being truthful "maybe two or three times" during the interview (id., p. 29).

Tomizzi conceded that for the most part he did not specifically recall most of the questions asked by SA Humphrey, but did recall it being "a rather calm conversation that continued from one question into the next" (id., p. 28).   No threats or promises were made to Fijal (id., p. 6).  At no point was Fijal told that he was free not to speak to them (id., pp. 28, 75), nor was he advised of his Miranda rights (id., p. 29).  Fijal did not ask them to leave the house (id., p. 7).  Tomizzi did not recall Fijal inquiring as to whether he should have an attorney (id., p. 28).

At the conclusion of the interview, SA Humphrey said that "they would be back in touch in a day or two"  and "mentioned something to him in the effect that we would like to

---

[3]      He later testified that "as the discussion turned towards Mr. Jacobsen, at that point the conversation did start switching to Mr. Fijal having additional information." August 24, 2012 hearing transcript [40], p. 23.

continue the conversation in the near future" (id., p. 31). The entire interview lasted approximately two hours (id., pp. 6, 16). Tomizzi took no notes (id., p. 12).

        SA Humphrey called Fijal and arranged the second interview, which occurred on August 10, 2011, at a public area called Canalside (id., pp. 7-8, 32). Tomizzi was not privy to this conversation (id., p. 32). Fijal walked to Canalside (id., p. 7). According to Tomizzi the conversation continued from the information Fijal provided on August 8, 2011 (id., p. 32). No promises or threats were made during this interview (id., p. 8). The interview ended with Fijal being told that if there was any further information he wanted to share that he should contact them, but that they "would be reaching out to him in the near future" (id., p. 8). Tomizzi was not privy to the second telephone call with Fijal that occurred a day or two later (id., p. 32).

        <u>Michael Fijal</u>, testified that he worked for HSBC as a Securities Processing Specialist. October 29, 2012 hearing transcript [41], pp. 4-5, 40. Fijal arrived at his house at approximately 5:30 p.m. on August 8, 2011, and took off his security badge and was checking the mail when there was a knock at the door (id., pp. 5, 7, 32-34). Although the outer storm door was closed, the inner door was open, permitting him to see SA Humphrey and Tomizzi, who were both dressed in plain clothes (id., p. 7). Fijal had never seen them before and did not know why they were at his house (id., pp. 7-8, 37). However, he was aware that law enforcement had been to the neighborhood a number of times talking to his neighbors about the fire (id., pp. 38-39). Thus, he admitted that he did not feel shocked or threatened when they appeared at his house (id., p. 39). He had lived in this house for almost 20 years and he considered it to be a safe and comfortable place (id., pp. 40-41).

He "opened the storm door halfway and said, 'May I help you?' And they introduced themselves" (id., p. 8). While he was holding his dog back, SA Humphrey and Tomizzi stepped into the house without asking or being invited in (id., pp. 9, 34). According to Fijal, this "was a little off putting", but his "main concern at that point was just holding the dog back" (id., p. 39).

The doorway entered directly into the living room, which was approximately 11' by 14' (id., pp. 9, 11, 37). Fijal pulled the dog towards the couch and "kind of sat down" (id., p. 9). SA Humphrey sat down on a love seat to Fijal's left, and Tomizzi sat on the chair, which was next to the front door and directly across from Fijal (id., pp. 9, 11). They were each situated approximately four to five feet from Fijal (id., p. 11). Fijal still had no idea why they were in his home (id., p. 37).

Roughly two minutes after they entered Fijal's house, SA Humphrey said, "'We want to speak with you about the fire at 179 Mackinaw Street.' Then he was asking me if I knew John Jacobsen and Daniel Skinner" (id., pp. 10, 12, 37-38). During this two-minute interval, Fijal did not ask them why they were in his home, because he "was just tired . . . and trying to hold the dog back. It was a little bit confusing" (id., p. 38).

When SA Humphrey asked Fijal about the night of the fire, he told him that he let his dog out at approximately 3:00 a.m. and could not fall back asleep, so had watched television (id., pp. 12-13). After he told SA Humphrey that he did not know anything about the fire, SA Humphrey responded, "'we have proof that you had paid . . . Jacobsen . . . to start the fire and you need to tell us a little bit more about that'" (id., p. 13). At that point, Fijal did not intend to go further and continue talking about the fire, and told SA Humphrey, "'Well, this is all I can tell

you.  I think we're done at this point.  I don't know anything else'" (<u>id.</u>, p. 13).  SA Humphrey

explained that they had evidence that he "'supplied some incendiary devices . . . to start the fire'"

(<u>id.</u>, pp. 13-14).

When Fijal continued his denials, SA Humphrey responded, "'we have proof that

you did, you need to tell us everything you know about this'" (<u>id.</u>, p. 14).  Eventually, Fijal, who

was exhausted, said, "'Look, I don't know what else to tell you.  I'm tired, I really just want you

to leave'" (<u>id.</u>, pp. 14, 46).  This occurred at approximately 6:00 to 6:15 p.m. (<u>id.</u>, p. 49).  SA

Humphrey responded, "'We can leave.  However, any special consideration that you can have to

cooperate in the future will be taken off the table'" (<u>id.</u>, p. 47).[4]  Fijal "didn't really respond to

that" (<u>id.</u>, p. 47).

They remained and continued telling him that they had proof of his involvement

and that he needed "'to come clean'" (<u>id.</u>, pp. 14, 15).  They also told him that if he cooperated

that they would talk to the prosecutor and he might get a plea offer (<u>id.</u>, p. 50).  Approximately

15 to 20 minutes after he first asked them leave, Fijal stated, "I don't know what you're talking

about.  I just want you to leave.  I'm exhausted, I'm tired and I just need time to think, I'm not

thinking clearly" (<u>id.</u>, pp. 16, 49).  At this point, SA Humphrey "sat forward" and said,

"'Look . . . you know you did it, we need you to come clean, and the . . . thing is . . . that if we

leave at this point in time, we will not be able to offer you any special consideration to cooperate

down the road anything is off the table  if we walk out that door'" (<u>id.</u>, p. 16).  Tomizzi also

leaned forward and in a stern voice and said, "'We know you did it, we're not interested in you.

---

[4]         Fijal conceded that he was not told that he would be arrested if he failed to cooperate.
October 29, 2012 hearing transcript [41], pp. 49-50.

What we want is the person that actually went into that structure to start the fire'" (id., pp. 17, 18, 48).  Fijal continued his denials and again asked them to leave (id., pp. 17, 20).

SA Humphrey "was getting a little bit more frustrated" and said, "'Now look . . . we told you you need to cooperate because any special consideration that we have will walk out that door with us if you don't tell us exactly what you know at this point in time'" (id., p. 18). This statement was repeated to Fijal "at least three" times (id., p. 25).  Fijal understood this to mean that "whatever I needed to tell him, I needed to tell him . . . at that point in time or else . . . I wouldn't be given any special consideration" (id., pp. 18-19).  Fijal continued his denials and asked them to leave "probably four, five" times (id., pp. 20, 25, 48).  At no point did they give any indication that they were going to leave (id., p. 20).

Fijal did not attempt to leave his home because  he did not think that "it was  wise . . . . based on their tone and the way they were sitting in the chairs . . . there's no way . . . especially with the positioning of the seating, the way it was with Mr. Tomizzi by the front door and Agent Humphrey on the love seat" (id., pp. 21, 45).  He also believed that if he left the house he would "just get arrested on the spot" (id., p. 79).  However, he admitted that he did not ask if he could leave, and that they were not blocking the door (id., pp. 45, 78).

The last time Fijal asked them to leave was at approximately 7:30 p.m. and  SA Humphrey "just got a little bit more aggressive and said, "'We told you . . . you've got to do this, you've got to tell us what you did'" (id., pp. 21-22).  Toward the end of the conversation before Fijal provided incriminating statements, SA Humphrey was yelling (id., p. 51).  Tomizzi continued to tell him that he needed to come clean, and SA Humphrey "again stated that . . .  any

special consideration - - and then by that time I just had it", and said, "'Look, I did it'" (id., p. 23). His confession came at approximately 7:45 to 7:50 p.m. (id., p. 49).

After he confessed, there was "a little bit more discussion, about 15 minutes or so" before they left at approximately 8:15 p.m. (id., pp. 10, 24, 26). Fijal does not recall what was discussed at that time, but remembers asking whether he was going to be arrested (id., p. 25).

Fijal admitted that no physical intimidation was employed (id., p. 44). Explaining why he confessed, Fijal testified: " I just wanted them to leave. I didn't - - nothing else to get them to leave my house was working"; "I was exhausted, I was confused" (id., p. 23). SA Humphrey's statements to him to the effect that he had to cooperate now or never also played a role in his decision to confess (id., p. 30).

Fijal conceded that he knew that he could have asked for an attorney, but did not do so (id., p. 46, 52). Prior to confessing, Fijal twice asked SA Humphrey if he was going to need an attorney, and he responded "'I can't advise on that'" (id., pp. 24, 53).

Before leaving, SA Humphrey said that "he was going to speak to the U.S. Attorney about this and he'll get back to me" (id., p. 54). At SA Humphrey's request, Fijal provided him with his cell phone number "because he did want to speak with me about this one other time and would let me know about any conversations that he might have had" (id., p. 26). However, Fijal informed him, "'Just please don't call me during business hours'" (id., p. 28).

He admitted that SA Humphrey's FD-302 report of the August 8, 2011 interview [25-1] was accurate (id., p. 31). However, it only summarized the first 15 and last 10 minutes of the interview (id., pp. 72-74).

Although Fijal had asked SA Humphrey not to contact him at work, while he was at work on August 10, 2011 Fijal received "probably four or five or six calls; some were from Mr. Tomizzi and some were from . . . Agent Humphrey" (id., pp. 26, 55). According to Fijal, HSBC "frowned" on personal calls, he stated but that he answered his cell phone "just to stop [it] from ringing" (id., pp. 55-56). Fijal recommended that they meet at Canalside, a public park (id., pp. 27, 56, 59).[5] He conceded that no one forced him to attend this meeting, and that he could have told SA Humphrey over the phone that he did not want to meet him, but did so because "I just felt like I didn't have a choice. I actually thought at that point in time that they were going to be arresting me anyhow and I didn't want it to be done at home" (id., pp. 58-59). He went to Canalside anticipating that he was going to be arrested (id., p. 60). This interview lasted approximately 45 minutes to an hour (id., pp. 61-62).

On August 12, 2011, SA Humphrey called him at work (id., pp. 28, 62-63). This call lasted no more than ten minutes (id., p. 28). When asked why he continued to talk to them, Fijal testified, "I made an admission . . . and I felt I had no choice . . . . I was bewildered, overcome. I mean, I just didn't know. I wasn't thinking clearly" (id., pp. 29, 63).

Fijal possessed a bachelors degree in Business Administration and had worked in the banking and finance industry for 30 years and was on the board of the Old First Ward Community Center (id., pp. 41, 42). He had no criminal history, and prior to these encounters, he had no experience with law enforcement as a criminal suspect (id., pp. 29, 42). Although Fijal

---

[5] Fijal previously adopted the content of his counsel's submission (gov. ex. 4 [38-1], ¶3), which stated that "[t]he officers advised Mr. Fijal that they wanted him to meet at a particular location" (gov. ex. 5 [38-2], ¶19).

was not advised of his <u>Miranda</u> rights, he admitted that he knew that he had these rights (<u>id</u>., pp. 42-43).

# ANALYSIS

**A.      Fijal's Motions**

**1.      Suppression of Statements**

In moving to suppress his August 8, 2011 statements, Fijal argues that they were involuntary (Fijal's Memorandum of Law [48], pp. 22-28), and that  he was questioned while in custody without  administration of <u>Miranda</u> warnings (<u>id</u>., p. 28).  He seeks to suppress his subsequent statements on August 10 and 12, 2011, as being "tainted by the initial illegality". Greenman Affidavit [8], ¶23.

**a.      Voluntariness of Fijal's August 8, 2011 Statements**

"A confession is admissible under the Constitution only if it is made voluntarily." <u>United States v. Orlandez-Gamboa</u>, 320 F.3d 328, 332 (2d Cir. 2003).  The government acknowledges that it  bears the burden of proving the voluntariness of a statement by a preponderance of the evidence. Government's Supplemental Response [49], p. 15.  *See* <u>Lego v. Twomey</u>, 404 U.S. 477, 489 (1972) .  This requires evaluation of the "totality of the circumstances in which [the statements] were given to determine whether the government agents' conduct 'was such as to overbear [a defendant's] will to resist and bring about confessions not freely self-determined.'" <u>United States v. Kaba</u>, 999 F.2d 47, 51 (2d Cir.), <u>cert. denied</u>, 510 U.S. 1003 (1993).

"Relevant factors . . . include the accused's age, his lack of education or low intelligence, the failure to give Miranda warnings, the length of detention, the nature of the interrogation, and any use of physical punishment . . . . A defendant's mental vulnerability also bears on the analysis." United States v. Siddiqui, 699 F.3d 690, 707 (2d Cir. 2012). *See* United States v. Ruggles, 70 F.3d 262, 265 (2d Cir. 1995) (finding that relevant factors include defendant's "background and experience, the conditions of his interrogation and the conduct of the law enforcement officers"). "No single criterion controls whether an accused's confession is voluntary". Green v. Scully, 850 F.2d 894, 901 (2d Cir.), cert. denied, 488 U.S. 945 (1988).

Since the parties have presented conflicting accounts of the August 8, 2011 encounter, "this case turns, as many do, on the issue of credibility". United States v. Bayless, 921 F.Supp. 211, 213 (S.D.N.Y. 1996). "It is within the province of the district court as the trier of fact to decide whose testimony should be credited . . . . And as trier of fact, the judge is 'entitled, just as a jury would be . . . to believe some parts and disbelieve other parts of the testimony of any given witness.'" Krist v. Kolombos Rest. Inc., 688 F.3d 89, 95 (2d Cir. 2012). An adverse credibility determination is "appropriately based upon inconsistent statements, contradictory evidence, and inherently improbable testimony". Diallo v. I.N.S., 232 F.3d 279, 287–88 (2d Cir. 2000).

In attacking Fijal's credibility, the government argues that he, "unlike the investigators, has a unique interest in the outcome of the case since he is facing a five . . . year mandatory term of imprisonment upon a conviction." Government's Supplemental Response [49], p. 18. I disagree. "Though it may pale in degree when compared to a defendant's, arresting officers have an indisputable interest in the outcome of cases they testify in. Anyone who believes

otherwise does not understand modern law enforcement." United States v. Gaines, 457 F.3d 238, 249 n. 7 (2d Cir. 2006).

Nevertheless, I agree with the government that "inconsistencies in the defendant's changing account of the events of August 8, 2011 cast doubt on the veracity of his entire testimony about the involuntariness of his statements." Government's Supplemental Response [49], p. 20. For example, while Fijal initially testified that the investigators initiated the August 8, 2011 interview by ringing the doorbell (October 29, 2012 hearing transcript [41], p. 32 ("I'm sure it was the doorbell . . . . Because my dog never just bolts out of the back room from a knock"), when confronted with the fact that he previously adopted the content of his counsel's submission (gov. ex. 4 [38-1], ¶3), which stated that the encounter was initiated by a knock at the door (gov. ex. 5 [38-2]), ¶10), he admitted that they knocked. October 29, 2012 hearing transcript [41], p. 32-34. At oral argument, Fijal's counsel argued that this was not critical to any issues. I disagree. This is far from a minor fact, as it also casts into doubt on his testimony that the investigators were able to circumvent him and enter his residence uninvited because he was holding his dog back - a dog that "never just bolts out of the back room from a knock". October 29, 2012 hearing transcript [41], pp. 9, 32, 34.

Fijal likewise adopted (gov. ex. 4 [38-1], ¶3) his counsel's representation that he "became confused" when the investigators entered his home (gov. ex. 5 [38-2]), ¶10). However, on cross-examination he testified that "[n]othing was confusing about it." October 29, 2012 [41], pp. 34-35. Fijal attempted to clarify this inconsistency by later testifying that "it was a little bit confusing about why they were there, but the events leading to that I wasn't confused about" (id., p. 35). However, this too, is difficult to reconcile with his testimony that he did not feel shocked

or threatened when they showed up at his house since he was aware that law enforcement had been to the neighborhood a number of times talking to his neighbors about the fire (id., pp. 38-39).

Fijal also adopted his counsel's representation (gov. ex. 4 [38-1]) that on August 10, 2011, he was told by the investigators "that they wanted to meet at a particular location." Gov. ex. 5 [38-2], ¶19. However, Fijal testified that he recommended Canalside as the location for their meeting. October 29, 2012 hearing transcript [41], pp. 27, 56, 58. Moreover, his current claim that the August 8, 2011 encounter was so coercive that they overcame his free will is difficult to reconcile with the fact that he voluntarily agreed to meet with the investigators two days later (id., pp. 58-59).

Further eroding Fijal's credibility, he testified that SA Humphrey told him at least three times that if he did not cooperate at that time, he would not have an opportunity to do so in the future (October 29, 2012 hearing transcript [41], pp. 18. 25), which he argues renders his statements involuntary under United States v. Anderson, 929 F.2d 96, 100-101 (2d Cir. 1991). Fijal's Memorandum of Law [48], p. 26. Notwithstanding the significance of such statements to the voluntariness inquiry, they were not included in Fijal's pretrial recitation of facts. Gov. Exs.

4, 5 [38-1, 38-2].[6]  I cannot believe that this would have occurred if it were true - particularly since the motion was filed by an experienced attorney.[7]

In any event, even if Fijal had made this allegation throughout, I would  decline to credit it, given the other inconsistencies in Fijal's testimony discussed above. *See*  United States v. Rogers, 2000 WL 101235, *8 (S.D.N.Y. 2000), aff'd, 225 F.3d 647 (2d Cir. 2000) (Summary Order) (declining to credit the defendant's testimony "under the doctrine of *falsus in unum, falsus in omnium*");  United States v. Weinstein, 452 F.2d 704, 713 (2d Cir. 1971), cert. denied, 406 U.S. 917 (1972) ("disregard of his oath is enough to justify the belief that the witness is capable of any amount of falsification, and to make it no more than prudent to regard all that he says with strong suspicion, and to place no reliance on his mere statements").

Nevertheless, I admit that I am troubled by SA Humphrey's and Tomizzi's inability to provide specifics as to what transpired during the one hour and forty interval before Fijal provided incriminating statements.  However, having observed  their demeanor and heard

---

[6]    I recognize  that Fijal stated in his pretrial submission that SA Humphrey indicated that he "needed to tell them immediately his involvement.  He indicated that they would not be responsible for what may happen to him in the future".  Greenman Affidavit [8], ¶14. However, this is distinct from Fijal's testimony that he relies upon now that SA Humphrey said, "'we told you you need to cooperate because any special consideration that we have will walk out that door with us if you don't tell us exactly what you know at this point in time.'" October 29, 2012 hearing transcript [41], p. 18. Moreover, Fijal did not initially argue that his August 8, 2011 statement was involuntary because of false and/or misleading statements by the investigators -  the issue addressed  in Anderson, 929 F.2d at 100.  Instead, he argued that his statements were involuntary because the investigators declined to leave his home and "continued to indicate . . . that they wanted him to make admissions to them at that point." Greenman Affidavit [8], ¶22.

[7]    At oral argument Fijal's counsel represented that Fijal had told him throughout his representation that SA Humphrey made these statements.  However, the evidentiary hearing is closed, he is an unsworn witness, and Rule 3.7 of the New York Rules of Professional Conduct states that a lawyer should not serve as both attorney and witness.

their generally consistent testimony (internally and *vis-a-vis* each other), I do not find that this deficiency undermines their otherwise credible testimony. *See* United States v. Infelice, 506 F.2d 1358, 1363 (7th Cir. 1974), cert. denied, 419 U.S. 1107 (1975) (determining that the informant's testimony "was credible in spite of his difficulties in recollection upon cross-examination").

After carefully considering the evidence adduced at the suppression hearing, including the testimony and demeanor of the witnesses, I credit SA Humphrey's and Tomizzi's accounts of the August 8, 2011 encounter over Fijal's account, and I conclude that Fijal's confession was voluntary. While Fijal points to his lack of experience with law enforcement (Fijal's Memorandum of Law [48], p. 24), it is undisputed that he was a college-educated professional, and there is no evidence suggesting that he had below-average intelligence or mental vulnerabilities. He also conceded that while he was not advised of his Miranda rights, that he was aware that he possessed these rights. October 29 2012 hearing transcript [41], p. 43.

In assessing the voluntariness of Fijal's statements, both parties rely on the fact that the interview was conducted in Fijal's home. Fijal's Memorandum of Law [48], pp. 24-25; Government's Supplemental Response [49], p. 15. Fijal argues that his right to be secure in his home was violated by the investigators' intrusion into his home and refusal to comply with his requests that they leave. However, since I do not credit Fijal's testimony that the investigators entered his home uninvited and did not comply with his requests for them to leave, I conclude that this factor weighs in favor of the voluntariness of the confession, especially since he was not physically restrained, handcuffed, or restricted while in his home. *See* United States v. Mason, 660 F.Supp.2d 479, 489 (W.D.N.Y. 2009) (Arcara, J./McCarthy, M.J.) ("Clearly one's home is a far less intimidating location in which speak to law enforcement agents than, for example, a police

station"); United States v. Crosby, 2010 WL 3304272, 4 (W.D.N.Y. 2010) (Scott, M.J.), adopted 2010 WL 3304266 (W.D.N.Y. 2010) (Arcara, J.) ("The interrogation occurred in the bedroom of Peace's home, not an coercive environment").

Fijal also argues that "even a slight promise of leniency may be deemed sufficient to overcome a defendant's will". Fijal's Memorandum of Law [48], p. 23. In support of this argument , he cites to Brady v. United States, 397 U.S. 742, 753-754 (1970), which in turn discusses Bram v. United States, 168 U.S. 532 (1897), wherein the Supreme Court observed that "a confession, in order to be admissible, must be free and voluntary; that is, must not be extracted by any sort of threats or violence, *nor obtained by any direct or implied promises*, *however slight*". Id. at 542-43 (emphasis added). However, more recent Supreme Court precedent has held that Bram "under current precedent does not state the standard for determining the voluntariness of a confession". Arizona v. Fulminante, 499 U.S. 279, 285 (1991).

Instead, as discussed above, voluntariness must be determined based on the totality of the circumstances. In that regard, "the presence of a direct or implied promise of help or leniency alone has not barred the admission of a confession where the totality of the circumstances indicates it was the product of a free and independent decision." Green, 850 F.2d at 901. While SA Humphrey admitted telling Fijal that they would communicate his cooperation to the prosecutor (August 9, 2012 hearing transcript [39], pp. 55, 65), "[i]n assessing the totality of the circumstances, vague promises of leniency for cooperation are just one factor to be weighed in the overall calculus and generally will not, without more, warrant a finding of coercion." United States v. Gaines, 295 F.3d 293, 299 (2d Cir. 2002).

"It has been recognized nevertheless that unfulfillable promises or certain other misrepresentations made to a suspect might render a confession involuntary because they overcome his desire to remain silent." Id. However, SA Humphrey's  vague promise to speak to the prosecutor does not amount to an unfulfillable promise or misrepresentation.  *See* id.  ("the agent simply said that the prosecutor and the judge would be made aware of Gaines' behavior if it amounted to cooperation. This vague description of the potential benefits of cooperation contained no material misrepresentations or unfulfillable promises").

I have no doubt that the questions posed to Fijal and the investigators' statements to him that he was not being truthful likely created a stressful situation for Fijal.  However, "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police officer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." Oregon v.  Mathiason, 429 U.S. 492, 495 (1977). *See* United States v. Astello, 241 F.3d 965, 967 (8th Cir.), cert. denied, 533 U.S. 962 (2001) ("Obviously, interrogation of a suspect will involve some pressure because its purpose is to elicit a confession.  In order to obtain the desired result, interrogators use a laundry list of tactics"). Notwithstanding the presence of coercive aspects to the interrogation, when balanced against Fijal's personal characteristics, the location of the interrogation, and the absence of any threats, promises or coercion, the totality of the circumstances demonstrate by preponderance of the evidence that his will was not overborne by the investigators during the August 8, 2011 interview.

### b.  Was Fijal in Custody on August 8, 2011?[8]

It is undisputed that Fijal was not given <u>Miranda</u> warnings on August 8, 2011.

However, "<u>*Miranda*</u> warnings are due only when a suspect interrogated by the police is 'in

custody.'" <u>Thompson v. Keohane</u>, 516 U.S. 99, 102 (1995). *See* <u>Weaver v. Brenner</u>, 40 F.3d 527,

534 -535 (2d Cir. 1994) ("the protections of the Fifth Amendment apply during custodial

interrogation of a criminal defendant, since that is when criminal proceedings begin").

In determining whether Fijal was in custody, I must first determine "whether a

reasonable person would have thought he was free to leave the police encounter at issue.  If the

answer is yes, the *Miranda* inquiry is at an end; the challenged interrogation did not require advice

of rights." <u>United States v. Newton</u>, 369 F.3d 659, 672 (2d Cir.), <u>cert</u>. <u>denied</u>, 543 U.S. 947 (2004).

If the answer is no, I must next consider "whether, in addition to not feeling free to leave, a

reasonable person would have understood his freedom of action to have been curtailed to a degree

associated with formal arrest . . . . Only if the answer to this second question is yes was the person

'in custody'".  <u>Id</u>.

In arguing that he was in custody, Fijal relies exclusively on his testimony that he

did not believe that he was free to leave.  Fijal's Memorandum of Law [48], p. 28.  Even if I credit

Fijal's subjective belief as to his custodial status, having considered all of the circumstances

surrounding Fijal's interrogation on August 8, 2011, I conclude that no reasonable person would

have considered their freedom of action to have been curtailed to a degree associated with formal

---

[8]        Although it could have been raised more clearly in Fijal's pretrial motion, he did argue
that he was in custody during the August 8, 2011 encounter without the benefit of <u>Miranda</u> warnings.
*See* Greenman Affidavit [8], ¶9.  Therefore, at oral argument, I provided the government with a brief
opportunity to make a written submission on this issue, but it declined, opting instead to rely on its oral
arguments.

arrest, and that Fijal was therefore not in custody at the time of his statements. Significantly, it is undisputed that Fijal was not handcuffed or physically restrained, and that the agents did not draw their weapons. *See* <u>United States v. Mitchell</u>, 2012 WL 6827387, *10 (W.D.N.Y. 2012) (Feldman, M.J.), <u>adopted</u>, 2013 WL 132459 (W.D.N.Y. 2013) (Larimer, J.) (concluding that the defendant was not in custody where, he "was never handcuffed, a form of restraint 'generally recognized as a hallmark of a formal arrest' . . . never advised . . . that he was under arrest or was going to be arrested, weapons were never drawn or displayed . . . , [and] was physically never touched or restrained by law enforcement during the highway encounter"). Fijal was also in familiar surroundings - his home. "[A]bsent an arrest, interrogation in the familiar surroundings of one's own home is generally not deemed custodial." <u>Newton</u>, 369 F.3d at 675.

Since, I conclude that Fijal's August 8, 2011 statements were neither involuntary nor in violation of <u>Miranda</u>, I recommend that his motion to suppress these statements be denied. Since Fijal seeks suppression of his August 10 and 12, 2011 statements solely on the basis that they were tainted by the August 8, 2011 encounter, I likewise recommend that these statements not be suppressed.


**2. Motion For a Bill of Particulars**

A defendant may obtain a bill of particulars only if the requested information is necessary "(i) to enable him to prepare his defense; (ii) to avoid unfair surprise at trial; and (iii) to preclude a second prosecution for the same offense." <u>United States v. Persico</u>, 621 F.Supp. 842, 868 (S.D.N.Y. 1985). "In deciding a motion for a bill of particulars, '[t]he important question is whether the information sought is necessary, not whether it is helpful.'" <u>United States v. Conley</u>,

2002 WL 252766, *4 (S.D.N.Y. 2002).  A bill of particulars "should not function to disclose evidence, witnesses, and legal theories to be offered by the Government at trial or as a general investigative tool for the defense".  United States v. Henry, 861 F.Supp. 1190, 1197 (S.D.N.Y. 1994).

It is Fijal's burden to "make a 'particularized showing of need' for the information." United States v. Gonzalez, 1994 WL 689065, *2 (S.D.N.Y. 1994).  The court "has the discretion to deny a bill of particulars if the information sought by defendant is provided in the indictment or in some acceptable alternate form." United States v. Barnes, 158 F.3d 662, 665 (2d Cir. 1998).  See United States v. Messina, 2012 WL 463973, *10 (E.D.N.Y. 2012) ("In determining whether a defendant has shown such necessity, the trial court 'must examine the totality of the information available to the defendant, including the indictment and general pre-trial discovery'").  "Whether to grant a bill of particulars rests within the sound discretion of the district court." United States v. Panza, 750 F.2d 1141, 1148 (2d Cir. 1984).

"[T]here is a special concern for particularization in conspiracy cases." United States v. Palmer, 2012 WL 2953659, *3 (W.D.N.Y. 2012) (Scott, M.J.) (citing United States v. Davidoff, 845 F.2d 1151 (2d Cir. 1988)).  Thus, "a bill of particulars or other adequate disclosure is appropriate where a conspiracy count covers a complex series of events over a number of years, but provides only the bare bones of the charge". Barnes, 158 F.3d at 666.

While many of the particulars Fijal seeks (Greenman Affidavit [8], ¶¶34(a)-(z)) relate to the conspiracy count of the Indictment, this is neither a complex nor long-term conspiracy.  It arises from a single fire at 179 Mackinaw Street in May 2011, and the conspiracy is

alleged to have existed from in or about May 2011 to in or about June 2011.[9]  The Indictment is

also not bare-bones.  It describes Fijal's alleged overt acts of paying a single co-conspirator to

start the fire.  Indictment [1], pp. 2-4, ¶¶1-5.

      While further particularization might be helpful to Fijal, "[a]s a general rule, the

defendant does not 'need' detailed evidence about the conspiracy in order to prepare for trial

properly."  United States v. Feola, 651 F.Supp. 1068, 1132 (S.D.N.Y. 1987), aff'd, 875 F.2d 857

(2d Cir.), cert. denied, 493 U.S. 834 (1989); see United States v. Chen, 2007 WL 2244213, *10

(S.D.N.Y. 2007) ("The Second Circuit . . . ha[s] routinely denied requests for Bills of Particulars

concerning the 'wheres, whens, and with whoms' of the crime charged").

      With respect to the second count of the Indictment [1] charging Fijal with

damaging and destroying 179 Mackinaw Street by means of fire, in violation of 18 U.S.C.

§§844(i) and 2, he seeks the identity of the individuals known to have maliciously damaged and

destroyed the residence, what acts were committed by these individuals and Fijal to destroy and

damage the residence, and what acts Fijal committed as an aider and abettor and as a principal.

Greenman Affidavit [8], ¶¶34aa. - 34dd.  However, Fijal provides no specific explanation as to

why these particulars are necessary to prepare his defense and avoid unfair surprise at trial.  Nor

has he contested the government's representation that "[m]ost of the information [he] seeks is

contained in the voluntary discovery provided by the government".  Government's Response [10],

p. 12.[10]  Therefore, Fijal's motion for a bill of particulars is denied in its entirety.

---

    [9]    Fijal erroneously argues that the Indictment "provides virtually no detail concerning the
*approximately 15 months* covered by the indictment." Greenman Affidavit [8], ¶37 (emphasis added).

    [10]    Although the government also references the Criminal Complaint in this case as
providing additional particularization (government's Response [10], ¶24), this case was commenced by
Indictment.

### 3. Motion for Disclosure of Informant Identities

Fijal moves under Fed. R. Crim. P. ("Rule") 16 for disclosure of "[t]he identify of any and all informants possessing information which may be material to defendant's alleged guilt or innocence", "[t]he identity of any and all informants who were present at any of the events which are described", and "[a]ny and all government reports containing information received from any informant". Greenman Affidavit [8], ¶43. According to Fijal, "the informants are percipient witnesses to the allegations contained in the . . . indictment, and may also possess exculpatory . . . information." Id., ¶44.

While the government does not expressly respond to this aspect of Fijal's motion, it generally argues that it "has complied with the requirements of Rule 16". Government's Response [10], ¶18. Rule 16 does not require the government to disclose the names of witnesses prior to trial. *See* United States v. Bejasa, 904 F.2d 137, 139 (2d. Cir.) cert. denied 498 U.S. 921 (1990). The government is also not required to provide early disclosure of the identities of informants unless it is essential to the defense. *See* Roviaro v. United States, 353 U.S. 53, 60–61 (1957).

Disclosure of a confidential informant's identity is an "extraordinary remedy". United States v. Muyet, 945 F.Supp. 586, 602 (S.D.N.Y. 1996). Defendant bears the burden of making "'a *specific* showing that disclosure was both material to the preparation of [the] defense and reasonable in light of the circumstances surrounding [the] case'". Bejasa, 904 F.2d at 139-140 (emphasis added). "Speculation that disclosure of the informant's identity will be of assistance is not sufficient to meet the defendant's burden; instead, the district court must be satisfied, after balancing the competing interests of the government and the defense, that the

defendant's need for disclosure outweighs the government's interest in shielding the informant's identity." United States v. Fields, 113 F.3d 313, 324 (2d Cir.), cert. denied, 522 U.S. 976 (1997). See Roviaro, 353 U.S. at 59; United States v. Jackson, 345 F.3d 59, 69 (2d Cir. 2003), cert. denied, 541 U.S. 956 (2004).

Fijal has not made this showing. "[I]t is not sufficient to show that the informant was a participant in and witness to the crime charged". United States v. Saa, 859 F.2d 1067, 1073 (2d Cir. 1988), cert. denied, 489 U.S. 1089 (1989). Therefore, this motion is denied.


## B.      Government's Cross–Motion for Reciprocal Discovery

The government moves for reciprocal discovery pursuant to Rule 16(b). Government's Response [10], ¶25. Fijal has not opposed this request. Therefore, the government's motion is granted. "Defendant shall provide such discovery, if any, not later than 30 days prior to trial or such other date as the District Judge may direct." United States v. Sikut, 488 F.Supp.2d 291, 304–5 (W.D.N.Y. 2007) (Foschio, M.J./Arcara, J.) (emphasis omitted).


## CONCLUSION

For these reasons, Fijal's motions for a bill of particulars and for disclosure of informant identities (Greenman Affidavit [8], ¶¶28-63) are denied, and the government's cross-motion for reciprocal discovery (government's Response [10], ¶25) is granted; and I further recommend that Fijal's motion to suppress his August 8, 10, 12, 2011 statements (Greenman Affidavit [8], ¶¶7-23) be denied.

Unless otherwise ordered by Judge Arcara, any objections to this Report, Recommendation and Order must be filed with the clerk of this court by April 25, 2013 (applying the time frames set forth in Rules 45(a)(1)(C), 45(c), and 59(b)(2)).  Any requests for extension of this deadline must be made to Judge Arcara.  A party who "fails to object timely . . . waives any right to further judicial review of [this] decision".  Wesolek v. Canadair Ltd., 838 F. 2d 55, 58 (2d Cir. 1988); Thomas v. Arn, 474 U.S. 140, 155 (1985).

Moreover, the district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but were not, presented to the magistrate judge in the first instance. Patterson-Leitch Co. v. Massachusetts Municipal Wholesale Electric Co., 840 F. 2d 985, 990-91 (1st Cir. 1988).

The parties are reminded that, pursuant to Rule 59(b)(2) of this Court's Local Rules of Criminal Procedure, "[w]ritten objections . . . shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for each objection, and shall be supported by legal authority", and pursuant to Local Rule 59(b)(3), the objections must include "a written statement either certifying that the objections do not raise new legal/factual arguments, or  identifying the new arguments and explaining why they were not raised to the Magistrate Judge".  Failure to comply with these provisions may result in the district judge's refusal to consider the objection.


DATED: April 8, 2013

/s/ Jeremiah J. McCarthy
JEREMIAH J. MCCARTHY
United States Magistrate Judge